We'll hear from counsel. Ms. Dahlenberg, you may proceed. Thank you, Your Honor. May it please the Court, I'm Heidi Dahlenberg of Riley Safer Homes in Kinsilla, here for State Farm, the Appellant. This is the second time this Court has considered the certification of a class of State Farm insurers that are challenging the adequacy of actual cash value insurance payments they received from State Farm. Exactly a year ago yesterday, this Court reversed an order of class certification in In Re State Farm Fire and Casualty Company, that's 872 F 3rd 567, and I'll refer to that case here today as the LaBriere case. The Court held in LaBriere that predominance failed in a case like this one because every single insured's claim was going to be subject to a property evaluation process. You could not know whether or not a single insured was properly paid actual cash value for their property without doing such an individualized evaluation. We submit that the same problem applies in this case as well and that predominance fails for the same reason here. Using this Court's language from LaBriere, there are no predominant issues of fact in this case. But it wasn't in LaBriere, you had to get to the fair market value, right, which is a different valuation than what is asserted here, which is simply it's a formulaic assessment of what amount was the labor depreciation on a given claim. You're correct, Your Honor, there are two important differences I think that the plaintiffs rely on heavily in this case. The first one is that in Arkansas there were two State Supreme Court decisions that you have to apply retroactively that announced in 2013 and 2015 that a company could not apply labor depreciation to calculate actual cash value. So that's one difference. There's a different standard there. The second difference that they point to is that in this case we have a definition of the method that we will use to calculate actual cash value. The policy says that the actual cash value is calculated as the amount it would cost to repair or replace property less depreciation. So those are the two things that the plaintiffs hang their hats on to try to distinguish LaBriere. But those are not actually material distinctions here for a very important reason. The plaintiffs are picking and choosing the parts of the contract that they are reading and they're overstating what Adams and Goodner in the Arkansas Supreme Court actually held. Adams and Goodner talked about the fact that in their view to get actual cash value you should receive a payment that pays you the full amount of the labor you need to repair your property on the one hand and then the depreciated value of materials. That's an equation and it's the equation that we now use for actual cash value calculations in Arkansas. But you could have an inflated replacement cost estimate that overstates what it's really going to cost someone to do repairs. And when you have that overstatement of replacement cost in the estimate itself, even if you apply labor depreciation, you may very well have paid that insured the right amount of money, even under Arkansas law, for their actual cash value. And let me just use Ms. Hood's claim as an illustration here. If you start with Ms. Hood, she had a water heater leak and her carpet got wet and she had some damage to her flooring. When State Farm did its estimate for her loss, State Farm assumed we were going to have to remove that carpet, take off the baseboards from the walls, put all that stuff back, repaint all the walls, etc. When we went out to look at that property a second time, when this lawsuit was filed, we had an expert general contractor who said, I'm looking at the carpet now. All it needed to have was cleaning. But even if we replaced that carpeting, we didn't need to pull up the baseboards or repaint the walls because of the way that the carpet was installed. So there was a substantial inflation of the original replacement cost estimate for that property. What would have happened in that situation? Did she get her money up front and then have to give something back to State Farm? State Farm did not ask for money back as part of this process, and State Farm generally doesn't. So there's no clawback. So as a matter of course, State Farm doesn't claw back if they think they've overpaid an individual claimant? In some instances, there are agreements that we overstated something in an estimate, and we and the policyholder will agree that money we've already paid for one thing will be applied to the next set of invoices that they might submit for replacement cost benefits. I don't know that State Farm doesn't have a right to ask an insured if a big mistake has been made on an estimate, and we find that out, that we couldn't ask for that money back. But what's going on here is we're not asking for that money back. We don't do it as a rule. And here what's really at issue is not do we want money back. It's about insureds who want more than they already have. And to really illustrate the extreme position that the plaintiffs take here, I want to talk about Mr. Stewart. Can I follow up on that thought a little bit? But if everybody sort of agrees, whether it's a general practice or a part of contractual agreement, that once you assess the value and you pay the claimant, whether that's high or whether that's low, that is the number that sort of proceeds on in time. Why isn't that a set amount that the formula can be applied to this labor depreciation for purposes of a class, that it's a freestanding number, it's a freestanding percentage on an original value that everybody really sort of agreed on, right or wrongly, but everybody agreed on? And why isn't that something that is easy to calculate for purposes of the class? Because the contract says so. Here the contract language is materially different than a lot of the contracts that the plaintiffs try to allude it to. So if you look at the contract itself, there are no fewer than three places where the contract specifically says this is a replacement cost policy. State Farm starts out its loss settlement provision with the statement, we will pay the cost to repair or replace your damaged property with similar construction, subject to the following. Until repair is done, we will pay the actual cash value capped by the policy limits or the cost to repair. After repair is over, we will pay only the additional amount that an insured actually incurs for repairs. So at the start, at the ACV stage and at the replacement cost stage, we make clear we are not going to pay more than it actually costs you to repair or replace your property. And that limitation is in there for exactly this reason. We issue an ACV payment. An insured is able to complete repairs. And this happens. We have it in the record. Insured completes all ACV repairs, every single thing that we estimated. They get all the work done for the money they already have in pocket. They want more money for those insureds, even though they're fully reimbursed for their loss. They make it absolutely clear. Mr. Stewart's situation is even more extreme. We did an ACV estimate for him. We paid him initially. He starts submitting his receipts for his Hot Springs property. We know we overstated just one line item in his replacement cost estimate by about $1,500 for repair of some flooring. He gives us all his receipts. We pay everything he has admitted under oath. We fully paid him for his loss. They want him to be paid $800-and-some in addition to that because of labor depreciation. And remember, the whole purpose of Adams & Goodner was make sure the policyholder gets paid the labor it needs to do repairs. Is that an injury issue, though, rather than? It is not, Your Honor, and here's why. And LaBriere recognized this. We still have a problem where we have to go out and figure out what was the right valuation for that property at the time. And when you have that kind of a situation, you have to look at that because merely because you have a methodology or a practice that you think might have caused injury to some people, if you can't figure out which are the injured and which ones aren't, you have a predominance problem because you have an injury and causation problem. Both of those, in our view, are part of the plaintiff's affirmative case. The district court said it's an affirmative defense, but either way, that's something that has to be grappled with as part of the predominance analysis. So look, for example, to a case like Wynn. It was out of Eastern District of Louisiana. After Hurricane Katrina, we had an insured who said, I want to sue on behalf of everybody because State Farm is improperly paying general contractor overhead and profit. They're paying too low of a rate. The district court there refused to certify the class because even though State Farm said this claim and this claim and this claim on their estimates would get an allowance for general contractor overhead and profit, the court said State Farm has an absolute right to come back and challenge whether or not that general contractor fee was really even going to be necessary on this claim. That is something they're entitled to prove. That means we don't have predominance, and you can't certify the class. We had a similar situation in Cartman, a decision out of the Seventh Circuit. The plaintiffs complained, you have a bad methodology that you're using to evaluate hail damage claims. And the court said, I can't certify that. State Farm has an absolute right to challenge whether or not it appropriately paid each and every one of those losses. But here we have the labor depreciation, which the state has said that's just not proper. So we do have an improper methodology, correct? We have a statement that you can't apply labor depreciation, but again, if you don't know what the right starting value is for your- So we'll take that for purpose of this question. Is there a spreadsheet out there that actually identifies the labor depreciation for each claim that is potentially a part of- That's an excellent question, Your Honor. The plaintiff's body of evidence that they talk about as their common proofs are that spreadsheet and all the claim files. It's absolutely clear you have to look at all the claim files for multiple purposes here. But let's talk about that spreadsheet. We generated a spreadsheet. It takes data from the last estimate we prepared for every claim. There is a calculation of labor depreciation taken from that last uploaded estimate. That last uploaded estimate may not reflect all the depreciation we've paid back. It is not what the original depreciation was that we initially assessed for a lot of the claims. For some it will be, for others it won't, because for a lot of claims there's multiple estimates. They build on each other. We also have estimates that are generated where no payment is ever even based on it. So it is not reliable evidence even of what labor depreciation was still outstanding at the end of a claim, for example. So that's a problem. Then besides that, you have to be able to match up what did we actually pay to the insured, either for ACV or for later replacement cost benefits. You can't do that based on the spreadsheet. Plaintiff's own expert says we have to start this case out, and the district court recognized, we have to start this case out by looking at all the files to figure out who even got an ACV payment with labor depreciation. Then we have to look at the timing of what happened with those labor depreciation payments. Then we have to go from there to actually see whether or not someone could still ask for a penalty for a late payment. Then we have to look at it for damages. But I'm here to tell you you have to look at it in order to determine liability as well. And we know from our file sampling that these are real problems, that we have thousands and thousands of potential class members who were fully paid replacement costs right from the very beginning and don't have a claim here, and there is no timing requirement on this. I see that I want to reserve some of my time. Can I ask one really brief question? I'm not sure I understand fully what all the arguments are, but I do think that there's a claim that's being asserted that under the Arkansas Administrative Code, there's this 45-day adjustment period, and that, therefore, this going back and reevaluating is improper. And I'm sure you don't agree with that. Can you tell me why? I can. What that regulation says is you have to go out within a specified period of time and let the policyholder know whether you're going to cover that claim. And if you can't do it that fast, you have to tell them why. There is nothing in there about a company not being able to go and reevaluate what really happened with loss. In fact, it happens all the time in individual cases. If we tried this as individual cases, we'd inspect every property. We'd have expert evidence of our own. We would not be tied to our estimate from the time of loss. Thank you. I'll reserve the rest of my time. Mr. Castleberry. Thank you, Your Honor. May it please the Court, my name is Casey Castleberry. I'm a lawyer who represents the plaintiffs' appellees in this matter. Your Honor, we submit to you that this case is ideally situated for class treatment and that the district court's order certifying the class should be affirmed. In reaching its decision, the district court had it before it, not one but two cases from the Arkansas Supreme Court, which held that the depreciation of labor was unlawful in Arkansas. It also had State Farms' admission that it depreciated labor as a matter of practice in calculating actual cash value during the entire class period. It also had the spreadsheet that Judge Kelly, you referred to, an excerpt of which is in the record in the appendix, pages 1431 to 1444. That spreadsheet identifies the amount of labor depreciation that was withheld from each and every class member and that was not paid as it should have been, according to Arkansas law. Based upon this information, the district court properly found that every single class member was damaged by State Farms' uniform practice of depreciating labor and that the class member's damages had already been calculated to the penny. The trial court certification was issued in strict compliance with Rule 23. When Mr. Stewart gets the money that he wanted to get, what will he do to his property? Your Honor, with respect to Stewart, I think he would fall. We have an equation that we propose to the district court that the district court accepted and put in her order, that the damages a class member will receive is the withheld labor depreciation minus the recovered labor depreciation plus 12% times the withheld labor depreciation. So Mr. Stewart received all of the labor depreciation that was initially withheld, but he would still be entitled to a penalty, Your Honor. They breached their contract with him. So this is a breach of contract action, basically. It is a breach of contract action, Your Honor. 98% of the policyholders, let's say, got what they were entitled to under the policy in terms of their having their property reconditioned or replaced or restored to the situation that it was in before. I don't know if that percentage is in the record, Your Honor, but one thing that LaBriere says I think is very important. This is a lawyer's lawsuit. We know that. Well, Your Honor, I think that this is a breach of contract. It's an entrepreneurial legal practice. Well, the Arkansas Supreme Court has said that you can't depreciate labor. They said it twice. And State Farm has depreciated labor. They depreciated labor by their own admission throughout the entire class period. The Arkansas law provides that if you don't pay the amount that you should pay under the policy, Arkansas Code Annotated Section 2379-208 provides for it. Why don't we just multiply how many claimants are here? Off the top of my head, Your Honor, the number of claimants. I think there were 12,000, as I recall. And multiply it by what's the penalty? Twelve percent penalty. Should be easy to calculate. Your Honor, the amount that they initially wrongfully withheld from each ACV payment would trigger the penalty under Arkansas law. There's no good faith exception. They are required to pay that penalty when they don't pay timely the amount that they were required to under law. I think, Your Honor, with respect to LeBrier, this is what State Farm hangs its hat on in this case. And respectfully, I don't believe it has any application to this case. LeBrier was decided on two bases, both of which were specific to Missouri law and both of which are significantly different in our case. First, LeBrier held that under Missouri law, ACV means the fair market value immediately before and immediately after the loss. And that that decision can only be reached under Missouri law by a jury. The jury's got to figure out how that fair market value is to be determined. The second basis upon which LeBrier was decided was that this court found that Missouri would not prohibit the depreciation of labor. Both of those are fundamentally different in our case. We have a policy that defines actual cash value as the replacement cost, the estimated replacement cost, less depreciation. It's a formula that applies to every single class member. And Judge Kelly, as you observed, the replacement cost has already been estimated in every case by State Farm. Our expert agreed that the spreadsheet would take care of it. Our expert was able to calculate damages. He testified that damages- In all 32,000 cases? That damages can be determined based upon the information that shelter maintains, excuse me, that State Farm maintains in its claim files and through the Xactimate software that it uses to adjust all the claims. Will there be plaintiffs who are overpaid? I mean, that seems to be State Farmers saying, look, there's some people, they get their full replacement cost value, and if you just add on this labor depreciation without going back and doing an assessment, you're going to be paying them more than what they contracted for in this insurance policy. Well, I think that goes back to two points, Your Honor. First, there's two separate obligations under the policy, as LeBrier recognized. There's the ACV obligation and the RCV obligation. We're alleging that they breached the ACV obligation, that they did not pay ACV timely in accordance with the policy and Arkansas law. The second part of that, the answer to that question, I believe, is this readjustment. They want to come back in and go readjust claims that they have already adjusted. And I think it's important, Your Honor, to look at what that regulation requires with respect to the 45-day rule. It requires that they complete their investigation. And Counsel for State Farm told you that means determine whether or not there's coverage, but that's not how investigation is defined in that regulation. It's defined as all activities of an insurer related to determining settlement outcome under coverage afforded by a policy. They've got to complete that investigation within 45 days. If they need more time, there's a procedure under the regulations where they can extend that time period. That time has long since run for all class members here, and I'd submit that they are bound by the replacement cost estimates that they have prepared. Is there a procedure for going back to reevaluate? Does this happen just as a matter of standard operating procedure, that once that estimate is made, then there's a reassessment and a shifting of money back and forth to make sure the right amount is paid out under the policy? I can't speak to whether that's ever happened, Your Honor, but in my reading of this regulation, it would be inconsistent with Arkansas insurance regulations. The Unfair Claims Settlement Practices Act requires that they complete that investigation within 45 days, and they're stuck with their investigation. They've now come back on Ms. Hood's claim, as was discussed a moment ago, and say, well, a lot of the things we said needed to be done don't actually need to be done. I submit to the court that they can't do that. They're stuck with the repair cost estimate that they prepared. What about the other way around? I think that if the plaintiff had a right under the policy to either seek an appraisal or to initiate a lawsuit if they feel like they were not paid enough money. But the insurance company is bound by the regulations promulgated by the Arkansas Insurance Department, and they were required to complete their investigation within 45 days. Your Honor, another significant part of State Farm's argument in this appeal is this cost of repair limitation of liability. They allege that ACV is capped at the actual cost of repair. As an initial matter, I disagree that that's what the policy says. But more importantly, LeBrier says ACV and RCV are two separate obligations. We know from Adams that you can't depreciate labor to arrive at ACV. Most importantly, we know from Shelter v. Goodner that even if you have a provision in your policy that allows you to depreciate labor, it is still unlawful, and that provision is not effective under Arkansas law. In Shelter, they had a provision in their policy that said we get to depreciate labor. It was clear and unambiguous. And the Arkansas Supreme Court said that provision violates Arkansas law, violates established principles of identity, and we will not recognize it as valid. Likewise, here State Farm is arguing that it is allowed to depreciate labor based upon a provision in its contract which it claims caps its exposure at the actual cost of repair. This argument is inconsistent with Arkansas Supreme Court's opinion in Goodner. Simply put, an insurance company cannot rely upon language in its policies that is inconsistent with Arkansas law. I think that's a very important point. With respect to that cost of repair argument, Your Honor, we cited on page 34 through 36 of our brief nine cases from across the country, including a case from the Sixth Circuit and a case from the Eleventh Circuit, which all hold that the actual cost of repair is irrelevant to the calculation of actual cash value. And just earlier this week, another federal district court in the Northern District of Mississippi found that the cost of repair is irrelevant to the inquiry of whether State Farm breached its contract when it depreciated labor. That case was provided to the court by notice of supplemental authority from counsel for State Farm on Monday. And it says, and I quote, The issue is not whether the actual cash value payment made by State Farm were reasonable or sufficient, but rather whether State Farm was entitled to deduct labor depreciation in the first place. End quote. That is exactly what we have here, Your Honor. The question is whether or not they were allowed to depreciate labor in the first instance. I submit to you that pursuant to Arkansas law, they were not. And each and every class member was damaged when they received an actual cash value payment that was less than they were entitled to pursuant to Arkansas law. The cases I would also point out that State Farm cites on that provision, on that point, are RCV cases. They're RCV payments. We agree that this policy caps the RCV payment at the actual cost of repair, but it does not cap the ACV payment at the actual cost of repair. And we know that based upon the plain language of the policy. There's two law settlement provisions in the policy. The first one deals with the ACV payment. The second one deals with the RCV payment. In both of those provisions, they reference the cost of repair, but only in one of those provisions do they say the actual cost of repair. State Farm knows how to craft their language such to make it clear that they're talking about the actual cost of repair, and they don't use actual or actually to modify the cost of repair in the ACV law settlement provision. And that just makes sense, Your Honors, because at the time the ACV payment is made, we don't know the actual cost of repair. We're all going off of estimates that State Farm has prepared. So it can't be referring to the actual cost of repair because we don't know that. Another way we know it's not the actual cost of repair is, as Council for State Farm just told you, they don't ever come back and ask for any overpayment. So if they paid the ACV amount and the insured is ultimately able to get the repairs done for less than that amount, under their theory you'd think that they would come back and ask for the extra money back. They don't because they know that that cost of repair limitation is not referencing actual cost of repair. It's referencing the estimated cost of repair that's prepared on their estimates by their adjusters. We believe that that provision is clear and unambiguous, and the trial court so found. However, if this court were to find or if the trial court was to find that it is ambiguous, then it would be strictly construed against State Farm, and we'd be allowed to bring in extrinsic evidence such as course of conduct, such as the fact that they don't ever seek to recover any alleged overpaid amounts as proof that the policy should be construed in favor of the construction we propose. Your Honors, all persons and entities that received actual cash value payments by State Farm during the class period were damaged by their uniform practice of depreciating labor, and Arkansas law is clear and unambiguous that their practice was contrary to Arkansas law. If, in fact, this case goes forward, do the plaintiffs recognize or agree or think that there will be some plaintiffs without damages, without any injury, without any cash returned? I don't think so, Your Honor. Your Honor, I think even the class members who were ultimately repaid the initially withheld labor depreciation were still damaged. They were damaged by the time value of money, which is a recognized element of damage, and they were damaged pursuant to the statute, which provides for a 12 percent penalty. So even those class members who ultimately were repaid the amount that was wrongfully withheld on the front end would be entitled to damages under our theory. And that's just the 12 percent? Yes, Your Honor. And is that distinguishing between the person that you've just described and the person who would be entitled to the labor depreciation return? Is that easily distinguished in what we're calling the spreadsheet, the documentation that's available? It is, Your Honor. State Farm can tell us through their records how much labor depreciation was initially withheld and how much the insured ultimately recovered. They know whether the insured came back to get that second payment, that RC payment. That is in their records. It's easily identified through the Xactimate software, and it's on the spreadsheet, Your Honor. What about those who were not injured for one reason or another but would be entitled to the cash value of their money? So, Your Honor, the way we define our class would only include those persons who received ACD payments from which labor was depreciated. So if you have a loss and you go to State Farm and you've already got your repairs done, for example, and this happens sometimes, or especially on smaller claims, they may pay you your entire amount up front. If they did, that person's not in our class. There was no labor depreciation applied on that claim. They're not part of the class. It's just the people who received ACD payments from which labor was depreciated. See that I'm about out of my time? Very well. Thank you, Your Honor. Your Honors, Adams and Goodner say absolutely nothing about whether or not someone is allowed to get payment for more than their replacement cost. When we define actual cash value as replacement cost, less depreciation. ACV is lower. There is nothing in Adams or Goodner that requires payment of more than insured's actual cost of repair. It simply wasn't part of the decision. Second, I've heard a lot about the penalty here. These are insureds who did not preserve their rights to ask for a penalty. The penalty statute says that you have to pay an amount due when it is due under the policy. Our policies say that any disputed sums are due within 60 days after a sworn proof of loss is submitted. The vast majority of these class members, including both named plaintiffs, never did a proof of loss. So the statute can't even be employed for them. In addition, you'd have to show a recovery of 20% and all that. So that doesn't apply. As far as the contract language is concerned here, it's critically important to understand that the cases that the plaintiffs are pointing to have materially different language. Our policy does not say that you can ignore the replacement cost provision that says I'm limiting you to your actual repair cost and just proceed under actual cash value. We do not structure the policy that way. So the cases that they're citing to are not apt. Instead, if you look at legacy condos, if you look at Lincoln Fountains, and if you look at the Steers case cited in our briefs, they make clear that when you have a policy like ours that's presently structured today, as soon as you have paid replacement cost that's actual, the estimate is irrelevant. You look to see what the actual incurred cost was to figure out whether someone was damaged. And then finally, if I could just very quickly, we're not talking about readjusting claims here. We're talking about figuring out who has been damaged. And I have to emphasize that the spreadsheet does not tell you the information that the plaintiffs say that it does. The way that you have to figure out labor depreciation is open up estimates and rejigger every single one of them to recalculate it one by one. Then you've got to look through our claim files to confirm information. But most critically important, there is repair information that is not in our files that our insureds never had to submit. We know from our file analysis that our expert did that 33% of the 250 claim files that he reviewed found that our replacement cost estimate overstated actual repair cost. That's 33% just of 250 claims that were examined. That is a strong indication that there are a lot of folks that got every penny that they were owed from their very first check, whether it was given to them as an ACV payment or a replacement cost payment. And you can't figure out who those folks are unless we get to do discovery, question them, get their repair records, and demonstrate that we did actually make an adequate payment. Thank you. Thank you. We will.